IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

| | | |
|---|---|---|
| PROGRESSIVE NORTHWESTERN INSURANCE COMPANY, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Civil Action No. 3:16-cv-010-WC |
| JOHN BOYDEN, and LIZZY CATHERINE HILL, individually and as personal representative of the estate of JIMMY L. HILL, SR., | ) ) ) ) ) | |
| Defendants. | ) ) | |

## MEMORANDUM OPINION AND ORDER

Before the court are the Motions for Summary Judgment (Docs. 29, 31, and 32) filed by the parties in this case. For the reasons that follow, the court concludes that Plaintiff's motion for summary judgment is due to be denied, that Defendants' motions for summary judgment are due to be granted, and that declaratory judgment is due to be entered in favor of Defendants.

## I.     BACKGROUND

On January 7, 2016, Progressive Northwestern Insurance Company ("Plaintiff") filed a complaint (Doc. 1) seeking, in pertinent part, a declaration that "Plaintiff has no duty to defend and/or indemnify John Boyden in connection with any claim brought against him" in underlying litigation concerning Boyden's automobile's collision with a vehicle operated by Jimmy L. Hill, Sr., on April 24, 2014, and that "Plaintiff has no coverage applicable to any claim or garnishment action that may be brought by Lizzie Catherine

Hill, individually or in her representative capacity as personal representative of the Estate of Jimmy L. Hill, Sr., or by any other claimant, in the event a judgment is obtained against Defendant Boyden for damages resulting from the April 24, 2014 collision[.]"  Compl. (Doc. 1) at 4-5.  On March 8, 2016, Defendant Lizzie Catherine Hill, in her individual and representative capacities, filed her Answer, Counterclaim, and Crossclaim (Doc. 9), in which, in pertinent part, she seeks a declaration that "Plaintiff has a duty to defend and indemnify Defendant Boyden in connection with the April 24, 2014 collision at issue in the underlying case[,]" and that "Plaintiff has coverage applicable to any claim or garnishment action that may be brought by Lizzie Catherine Hill, individually and/or in her representative capacity[.]"  Doc. 9 at 15-16.  On March 10, 2016, Defendant Boyden filed his Answer and Counterclaim for Declaratory Judgment (Doc. 12), in which he, too, seeks a declaration that "Plaintiff has a duty to defend and indemnify" him "in connection with any claim brought against him arising from damages sustained by Jimmy L. Hill, Sr., or any other claimant, as a result of the April 24, 2014, collision[,]" and that "Plaintiff does, in fact, have coverage applicable to any claim or garnishment action that may be brought by Lizzie Catherine Hill, individually or in her representative capacity[.]"  Doc. 12 at 4-5.

On March 24, 2016, Plaintiff filed a motion to dismiss (Doc. 13) Defendant Hill's counterclaim.  Thereafter, on March 31, 2016, Defendant Hill noticed her dismissal of her counterclaim against Plaintiff and her crossclaim against Boyden pursuant to Rule 41(c) of the Federal Rules of Civil Procedure.  Accordingly, the court entered its Uniform Scheduling Order (Doc. 27) on May 26, 2016, and the case proceeded into discovery.  On October 31, 2016, Plaintiff filed its motion for summary judgment (Doc. 29).  Defendants

2

Boyden and Hill filed their cross motions for summary judgment (Docs. 31 & 32) on November 2, 2016. All motions are fully briefed and are ripe for determination.

## II.   STANDARD OF REVIEW

Under Rule 56(a) of the Federal Rules of Civil Procedure, a reviewing court shall grant a motion for "summary judgment if the movant shows that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). Only disputes about material facts will preclude the granting of summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). "An issue of fact is 'genuine' if the record as a whole could lead a reasonable trier of fact to find for the nonmoving party. An issue is 'material' if it might affect the outcome of the case under the governing law." *Redwing Vehicleriers, Inc. v. Saraland Apartments*, 94 F.3d 1489, 1496 (11th Cir. 1996) (quoting *Anderson*, 477 U.S. at 248).

Under Rule 56, summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The party asking for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrates the absence of a genuine issue of material fact." *Id.* at 323. The movant can meet this burden by presenting evidence showing there is no dispute of material fact, or by showing that the nonmoving party has failed to present

evidence in support of some element of his case on which he bears the ultimate burden of proof.  *Id.* at 322–23.

Once the movant has satisfied this burden, the nonmoving party must "go beyond the pleadings and by his own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'"  *Id.* at 324.  In doing so, and to avoid summary judgment, the nonmovant "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  The parties must support their assertions "that a fact cannot be or is genuinely disputed" by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations[], admissions, interrogatory answers, or other materials" or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact."  Fed. R. Civ. P. 56(c)(1)(A) & (B).

If the nonmovant "fails to properly address another party's assertion of fact" as required by Rule 56(c), then the court may "consider the fact undisputed for purposes of the motion" and "grant summary judgment if the motion and supporting materials – including the facts considered undisputed – show that the movant is entitled to it."  Fed. R. Civ. P. 56(e)(2) & (3).

In determining whether a genuine issue for trial exists, the court must view all the evidence in the light most favorable to the nonmovant.  *McCormick v. City of Fort Lauderdale*, 333 F.3d 1234, 1243 (11th Cir. 2003).  Likewise, the reviewing court must

4

draw all justifiable inferences from the evidence in the nonmoving party's favor. *Anderson*, 477 U.S. at 255. However, "mere conclusions and unsupported factual allegations are legally insufficient to defeat a summary judgment motion." *Ellis v. England*, 432 F.3d 1321, 1326 (11th Cir. 2005) (per curiam). Furthermore, "[a] mere 'scintilla' of evidence supporting the opposing party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party." *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990); *see also Anderson*, 477 U.S. at 249-50 ("If the evidence [on which the nonmoving party relies] is merely colorable, or is not significantly probative, summary judgment may be granted.") (internal citations omitted).

This court has recently addressed a court's review of cross-motions for summary judgment as follows:

> Cross-motions for summary judgment "must be considered separately," and "each movant bears the burden of establishing that no genuine issue of material fact exists and that it is entitled to judgment as a matter of law." *Shaw Constructors v. ICF Kaiser Eng'rs, Inc.*, 395 F.3d 533, 538–39 (5th Cir. 2004); *see also Bricklayers, Masons & Plasterers Int'l Union of Am., Local Union No. 15 v. Stuart Plastering Co.*, 512 F.2d 1017, 1023 (5th Cir. 1975) ("Cross-motions for summary judgment will not, in themselves, warrant the court in granting summary judgment unless one of the parties is entitled to judgment as a matter of law on facts that are not genuinely disputed."). In some cases, "[c]ross motions for summary judgment may be probative of the nonexistence of a factual dispute." *Shook v. United States*, 713 F.2d 662, 665 (11th Cir.1983). However, the existence of cross motions for summary judgment "'do[es] not automatically empower the court to dispense with the determination whether questions of material fact exist.'" *Ga. State Conference of NAACP v. Fayette Cty. Bd. of Comm'rs*, 775 F.3d 1336, 1345 (11th Cir. 2015) (quoting *Lac Courte Oreilles Band of Lake Superior Chippewa Indians v. Voigt*, 700 F.2d 341, 349 (7th Cir. 1983)). This is so because "each party moving for summary judgment may do so on different legal theories dependent on different constellations of material facts. Indeed, cross-motions for summary judgment may

demonstrate a genuine dispute as to material facts as often as not." *Bricklayers*, 512 F.2d at 1023.

"'[W]hen both parties proceed on the same legal theory and rely on the same material facts[,] the court is signaled that the case is ripe for summary judgment." *Shook*, 713 F.2d at 665. Even then, however, "[a] court may discover questions of material fact even though both parties, in support of cross-motions for summary judgment, have asserted that no such questions exist. . . . Thus, before the court can consider the legal issues raised by the parties on cross-motions for summary judgment, it must have no doubt as to the relevant facts that are beyond dispute." *Griffis v. Delta Family–Care Disability*, 723 F.2d 822, 824 (11th Cir. 1984) (adopting order of district judge on summary judgment).

*Till v. Lincoln Nat'l Life Ins. Co.*, 182 F. Supp. 3d 1243, 1248-49 (M.D. Ala. April 25, 2016) (footnote omitted).

## III.   STATEMENT OF FACTS[1]

### A.   The Accident

This litigation concerns an automobile accident involving Defendant Boyden and Jimmy L. Hill, Sr., on April 24, 2014, in Phenix City, Alabama. On that morning, Boyden

---

[1] The parties did not adhere to the Uniform Scheduling Order's requirement that, in any brief in support of or in opposition to a motion for summary judgment, the parties "shall include a statement of facts divided into two parts: Uncontested Facts and Contested Facts." Doc. 27 at 2. To facilitate compliance with this requirement, the Order further instructed that, prior to filing a motion for summary judgment, "the parties shall confer and agree upon the facts which are uncontested; those facts shall be identical in each party's brief." *Id.* The parties appear to attribute their collective failure to adhere to the court's Order to their inability to agree upon a set of uncontested facts before filing their various motions. *See* Doc. 29-1 at 3; Doc. 35 at 1; *id.* at n.1; Doc. 32-1 at 1-2. Despite the parties' failure, the statement of facts in each brief in support of summary judgment is nearly identical, and the parties appear to agree that there are few, if any, disputes of material facts in this matter. Because the court agrees with that assessment, and because the facts are easily reflected in the record evidence submitted in support of the parties' motions, in this instance the court will not impose the sanction—dismissal of the motions—contemplated by the Uniform Scheduling Order for a party's "[f]ailure to comply strictly" with the requirements of the Order. *See* Doc. 27 at 2. Instead, the court will craft a statement of facts using the parties' various statements of contested facts.

and his wife were traveling to Maine after spending the winter in Florida. Deposition of John Boyden (Doc. 29-3) ("Boyden Dep.") at 7:4-17; 51:4-6; 53:3-54:6. The Boydens typically spent half the year living in Florida, and the other half living in Maine. *Id.* at 7:4-7. They spent several days at the Uchee Creek campground in Fort Benning, Georgia during the trek. *Id.* at 7:14-17, 51:3-14. The Boydens departed the campground and headed toward Columbus, Georgia, on Highway 431 with Boyden driving his 2006 Dodge Ram 3500 truck. *Id.* at 11:1-5; 59:8-13. The truck towed a 28-foot Holiday Rambler travel trailer the Boydens used for camping. *Id.* at 11:1-5. The trailer weighed approximately 11,800 pounds. *Id.* at 91:16-19. Boyden was also transporting his 2005 Maliguta Ciak scooter. *Id.* at 11:1-10. The scooter weighed approximately 300 pounds. *Id.* at 14:12-15:1. The scooter was secured to a motorcycle carrier attached to the rear of the travel trailer. *Id.* at 12:11-16. The motorcycle carrier weighed approximately 40-45 pounds. *Id.* at 43:20-44:9. The motorcycle carrier attached to a trailer hitch on the rear of the travel trailer, but was not supported by wheels and had no contact with the ground.

　　As Boyden approached the intersection of Highway 280 and Highway 431 in Russell County, Alabama, Boyden crested the top of a hill, looked down the hill, and saw an overpass and a traffic signal beyond that. *Id.* at 60:5-13. After emerging from under the overpass, Boyden saw that the light had turned yellow, but he was unable to stop his vehicle before entering the intersection. *Id.* at 60:15-23. At the intersection, the front end of Boyden's truck and the right side of the travel trailer collided with the front end and driver's side door of the vehicle driven by Mr. Hill. *Id.* at 18:7-19. Mr. Hill died

7

as a result of the injuries he sustained in the accident.  Compl. (Doc. 1), *Hill v. Boyden*, No. 3:15cv687-MHT-GMB (filed Sept. 21, 2015).

The truck Boyden was driving, and the attached travel trailer, were insured by insurers other than Progressive.  Boyden Dep. (Doc. 29-3) at 80:1-7; 86:11-20.

## B.     The Scooter

Boyden owns a 2005 Maliguta Ciak scooter.  *Id*. at 11:6-10.  Boyden and his wife primarily used the scooter as back-up transportation while traveling—to attend yard sales on Saturdays, visit the beach, and to run back and forth to the commissary on Tyndall Air Force Base, as well as for transportation and leisure purposes while they reside in Maine. *Id*. at 16:15-17:8, 22:10-23:3.

At the time of the accident, the scooter was affixed to a motorcycle carrier that was mounted to the receiver at the back of the trailer.  *Id*. at 12:21-13:17.  To place the scooter in the motorcycle carrier, Boyden would take the removable ramp off the motorcycle carrier and place it on the back of the carrier.  *Id*. at 13:18-22.  He then would push the scooter up the ramp while his wife held it level into the carrier hold.  *Id*. at 15:2-11.  Each of the two wheels on the scooter was then placed down in a hole or well, enabling the scooter to stand upright.  *Id*. at 14:15-17.  At the time of the accident, the scooter was secured to the motorcycle carrier and strapped down with four straps, which were cranked tight around the scooter's two wheels.  *Id*. at 12:11-16; 15:12-23.  There was also a locked chain securing the scooter to the trailer.  *Id*.

8

**C.     The Scooter and the Accident**

Neither the scooter, receiver, nor carrier came into contact with Mr. Hill or his vehicle during the collision.  *Id.* at 18:7-19:5.  Before, during, and after the impact, the scooter remained on the motorcycle carrier with all of the restraints placed by Boyden intact.  Boyden's Answer to Pl.'s Interrogatories Nos. 8-9 (Doc. 29-7), Ex. D to Pl.'s Mot. for Summ. Judgment; Boyden Dep. at 19:6-8.  The scooter's ignition was not on and the keys to the scooter were in the cab of the truck with Boyden at the time of the accident. Boyden Dep. at 87:6-17.

After the accident, the only known damage to the scooter was to a reflector that had popped off the scooter's fender.  *Id.* at 89:1-14.  Boyden picked up the reflector, and eventually glued the reflector back on.  *Id.*  Boyden did not observe any other damage to the scooter.  *Id.* at 20:13-21:1.  The scooter was transported with the travel trailer to a camper repair business after the accident, where it remained unused for several months. *Id.* at 19:6-21.  Boyden was not able to start it afterwards; he speculates that, during the several months it spent sitting idle, the "gas had gummed up the carburetor."  *Id.* at 19:16-21.  Boyden did not make a property damage claim with Progressive or any other insurer for physical damage to the scooter.  *Id*. at 21:15-20.

Although Boyden acknowledged that the total weight of his traveling unit, including the 300 pound scooter and about 40 or 45 pound scooter carrier, precluded him from stopping in time to avoid the collision,  *id.* at 62:14-23, 63:22-64:14, he also testified that having the scooter and motorcycle carrier attached to the rear of the travel trailer does not affect his handling of the truck while driving.  *Id.* at 93:19-94:7.

9

**D.     The Insurance Policy**

Plaintiff issued motorcycle policy number 42925615-8 to Boyden on February 21, 2014.  Policy (Doc. 29-4) at 1, Ex. B to Pl.'s Mot. Summ. J.  The policy covered the period from March 31, 2014, through March 31, 2015.  *Id.*  Although the policy is specifically titled "Maine Motorcycle Policy," and Boyden's insurance agent works out of an agency in Maine, Boyden's "Renewal Declarations Page" indicates that his address is Tyndall Air Force Base in Florida.  *Id.*  Part I of the policy covers "Liability to Others."  The "Insuring Agreement" reads as follows:  "If you pay the premium for this coverage, we will pay damages for bodily injury and property damage for which an insured person becomes legally responsible because of an accident."  *Id.* at 16.  The policy goes on to define an "insured person" as, in pertinent part, "you or a relative with respect to an accident arising out of the ownership, maintenance, or use of a motorcycle[.]"  *Id.*  The terms "arising out of," "ownership," "maintenance," and "use" are not defined in the policy.[2]  The policy defines a "motorcycle" as "any motorcycle, motorbike, motor scooter, or motorized trike that is designed for operation principally upon public roads and has at least two wheels, but not more than three wheels."  *Id.* at 14.  Although the "Liability to Others" section sets forth many exclusions for Plaintiff's "duty to defend" an "insured

---

[2]  Notwithstanding the policy's failure to define these terms, in the "General Definitions" section of the policy, "occupying" is defined as "in, on, entering, exiting, mounting or dismounting." Notably, an "insured person" is not required by the policy to be "occupying" the scooter at the time of an accident in order for the insurer to owe a duty to defend.

person," there are no exclusions pertaining to injuries resulting from accidents during which the covered "motorcycle" is being transported but is not occupied.

## IV.   DISCUSSION

The parties appear to agree that Maine law governs this court's construction of the insurance contract at issue. *See* Doc. 29-1 at 4 n.1; *id.* at 10-11 (Plaintiff discussing Maine cases interpreting contract language); Doc. 35 at 4-5 (Hill discussing construction of contract terms in Maine cases); Doc. 31 at 9 (Boyden assuming correctness of Plaintiff's contention that Maine law applies); Doc. 32-1 at 6; *id.* at n.2 (Hill declining to dispute that Maine law applies for purposes of the summary judgment motions). The court agrees. *See, e.g., New Hampshire Ins. Co. v. Hill*, 516 F. App'x 803, 805 (11th Cir. 2013) ("Because the district court sat in Alabama, it was obliged to follow Alabama's *lex loci contractus* doctrine, which requires that Alabama courts interpret contracts according to the law of the state in which they were made.").

Plaintiff seeks a declaratory judgment that it owes no duty to defend its insured in the tort litigation underlying this matter. "To determine whether an insurer owes its insured a duty to defend, Maine courts apply the 'comparison test,' which involves a 'comparison of the allegations in the underlying complaint with the provisions of the insurance policy' to determine if the claims alleged are within the coverage of the policy." *Lyman Morse Boatbuilding, Inc. v. N. Assur. Co. of Am.*, 772 F.3d 960, 965 (1st Cir. 2014) (quoting *Mitchell v. Allstate Ins. Co.*, 36 A.3d 876, 879 (Me. 2011)). "An insurer's refusal to defend is proper only when the allegations of the complaint fall completely outside the policy." *Cox v. Commonwealth Land Title Ins. Co.*, 59 A.3d 1280, 1283 (Me. 2013)

11

(citing *Mitchell*, 36 A.3d at 879).  As such, the insurer must defend the insured even if the court's reading of the complaint and policy "reveals a mere *potential* that the facts may come within coverage[.]"  *Id.* (citation omitted) (emphasis in original).  This court must "evaluate the policy in its entirety, including any exclusions and exceptions, to determine whether [Plaintiff] has a duty to defend [Boyden]."  *Id.* (citation omitted).

In reviewing the insurance contract, "[u]nambiguous contract language must be interpreted according to its plain meaning."  *Travelers Indem. Co. v. Bryant*, 38 A.3d 1267, 1269 (Me. 2012) (citation omitted).  However, "[b]ecause the duty to defend is broad, any ambiguity in the policy regarding the insurer's duty to defend is resolved against the insurer, and policy exclusions are construed strictly against the insurer."  *Mitchell*, 36 A.3d at 879.  This comports with the general rule in Maine that "[a]ny ambiguity in an insurance contract is construed strictly against the insurer and liberally in favor of the insured."  *Bryant*, 38 A.3d at 1269 (quotation omitted).  "A provision of an insurance contract is ambiguous if it is reasonably susceptible of different interpretations or if any ordinary person in the shoes of the insured would not understand that the policy did cover claims such as those brought."  *Id.* (quotation omitted).  *See also Union Mut. Fire Ins. Co. v. Commercial Union Ins. Co.*, 521 A.2d 308, 310 (Me. 1987) (quotation and citation omitted) ("[T]he contract language is to be viewed from the perspective of an average person untrained in the law or the insurance field in light of what a more than casual reading of the policy would reveal to an ordinarily intelligent insured.").  Ultimately, there is no "formula for defining the outer limits of a 'reasonable reading' of . . . ambiguous policy language."  *Genthner v. Progressive Cas. Ins. Co.*, 681 A.2d 479,

482 (Me. 1996).  Rather, the "exact line between 'reasonable' and 'unreasonable'" is "defined on a case-by-case determination."  *Id.*

For purposes of Maine's "comparison test," the undersigned notes the following regarding the underlying complaint in this matter.  The insured was sued in the state court,[3] where the plaintiff alleged that the insured's negligence caused the decedent's wrongful death and decedent's spouse's loss of consortium.  *See* Doc. 29-5 at 4-6.  In particular, the underlying plaintiff alleged that, "while operating a unit consisting of a 2006 Dodge Ram 3500, Savoy SL by Holiday Rambler travel trailer ('travel trailer'), and a 2005 Malaguti Ciak scooter ('scooter')," Boyden "negligently disregarded the traffic signal at the intersection of U.S. Highway 431 and U.S. Highway 280 in Russell County, Alabama, running a red light, traveling through the intersection, and colliding with the vehicle driven by Decedent."  *Id.* at ¶¶ 7, 10.  The plaintiff in the underlying litigation alleges that "[t]he combination of Defendant's Dodge Ram, travel trailer, and scooter formed the traveling unit that caused the injuries . . . to Decedent Jimmy L. Hill, Sr."  *Id.* at ¶ 8.

As set forth above, Plaintiff's duty to defend Boyden in the underlying litigation is triggered if there is any potential that proof of the facts alleged in the underlying complaint will come within the coverage described in the subject insurance policy.  *Cox*, 59 A.3d at

---

[3]  The matter was subsequently removed by Defendant Boyden to the United States District Court for the Middle District of Alabama, where it was stayed pending the outcome of this litigation. *See* Order (Doc. 15), *Hill v. Boyden*, No. 3:15cv687-MHT-GMB (noting previous entry of stay, ordering administrative closure of case, and requiring the parties to file periodic joint status reports).

1283.  The parties appear to agree that the crux of the question before the court is thus whether Boyden is an "insured person" within the meaning of the policy in that the accident which caused the bodily injury and/or property damage described in the underlying complaint arose out of Boyden's "ownership, maintenance, or use of a motorcycle[.]"  Doc. 29-4 at 3.  *See, e.g.,* Doc. 29-1 at 10-13 (Plaintiff arguing that it is entitled to summary judgment because "the accident or injuries did not 'arise out of' Boyden's 'ownership, maintenance, or use'" of the scooter); Doc. 31 at 9-18 (Boyden arguing that he is entitled to summary judgment because the accident arose out of his ownership, use, or maintenance of the scooter); and Doc. 32-1 at 7-12 (Hill arguing that she is entitled to summary judgment because the accident arose out of Boyden's ownership, use, or maintenance of the scooter).[4]

---

[4]   Plaintiff appears to briefly offer another reason why it is entitled to declaratory judgment, arguing "the vehicle involved in the loss was not a motorcycle."  *See* Doc. 29-1 at 9-10.  Plaintiff's theory in this regard appears to be that because Boyden was operating his truck when he caused the accident, and a truck is not a motorcycle, there is no coverage under the policy.  Plaintiff's argument is easily refuted.  There is no doubt that the scooter was "involved" in the accident.  The scooter was part of the traveling unit and contributing, even if only very slightly, to the overall weight of the unit that precluded Boyden from stopping before his unit entered the intersection. The case cited by Plaintiff in support of this argument, *Farmers Ins. Co., Inc. v. Wilson*, 424 S.W.3d 487 (Mo. Ct. App. 2014), is inapposite.  There, claimants sought to "stack" liability coverage afforded by a motorcycle policy with other possible coverages stemming from an accident involving claimants' decedent, who was a passenger in a vehicle driven by an insured person possibly covered by multiple automobile liability policies, and a single motorcycle policy. *Id.* at 490-91.  The accident involved a 2002 Dodge Intrepid.  *Id.* at 490.  The motorcycle was not involved in the accident.  The Missouri Court of Appeals held simply that the Dodge, as the lone relevant vehicle involved, was not a motorcycle within the meaning of the motorcycle policy, and, therefore, no coverage under the policy applied.   *Id.* at 492.  This is vastly different from the circumstances in this case, where, as discussed above, the covered motorcycle was at the scene of the accident as a component of the traveling unit, and was contributing, however slightly, to the weight of Boyden's unit.

As discussed previously, the policy does not offer a definition of the terms that control the issue before the court.  However, Maine law affords some guidance as to what is meant by "arising out of."  *See Acadia Ins. Co. v. Vermont Mut. Ins. Co.*, 860 A.2d 390, 393 (Me. 2004) (internal quotation omitted) (favorably citing a case affording "arising out of" a "broad interpretation" in an insurance contract, to wit: "originating from, growing out of, flowing from, incident to or having connection with").  Likewise, Maine law affords some guidance as to what may constitute "use" under the policy.  The Supreme Judicial Court of Maine has previously observed that, in the context of the language of the omnibus clause found in the instant contract, "[t]he word 'use' is a general catch-all term, encompassing all proper uses of a vehicle."  *Union Mut. Fire Ins. Co.*, 521 A.2d at 310.  Maine law thus requires "a broad construction" of the term.  *Id.* Accordingly, Maine courts have interpreted "use" as "'broader than operation'" of a motor vehicle, which is described as "manipulation of the car's controls in order to propel it as a vehicle." *Id.* (quoting *Allstate Ins. Co. v. Lyons*, 400 A.2d 349, 352 (Me. 1979)).

Under the "broad construction" afforded to the term "use," Maine courts have found, for instance, that an automobile was in use where a firearm accidentally discharged while being unloaded from the automobile during a hunting excursion. *Id.* at 311.  In any event, "whether a particular injury is within the meaning of the 'ownership, maintenance or use' clause of an insurance policy, the cases are in general agreement that a causal relationship must exist between the accident or injury and the ownership, maintenance or use of the vehicle."  *Id.* at 310 (citation omitted).  Importantly, the "causal relationship between the proper use of the vehicle and subsequent injury need not be the proximate

15

cause of the injury; coverage will be extended if there is a reasonable causal connection between the use and the injury." *Id.* at 311 (citation omitted).

Against this backdrop of principles, the parties have cited numerous cases from around the country in support of their contentions that the accident in this matter did, or did not, arise out of Boyden's use, ownership, or maintenance of the scooter. Although no case presents the precise circumstances as this case, numerous courts have found coverage under circumstances similar to this matter. *See, e.g., American Fire & Cas. Co. v. Allstate Ins. Co.*, 214 F.2d 523, 525 (4th Cir. 1954) (finding Jeep in-tow was in use pursuant to similar policy language because towing Jeep subjected it to "the vicissitudes and dangers of travel on the public highway," and Jeep was "employed" in a manner that was not "so unusual as not to have been within the contemplation of the parties to the insurance contract"); *State Auto. Mut. Ins. Co. v. State Farm Mut. Auto. Ins. Co.*, 456 F.2d 238, 239 (6th Cir. 1972) (Jeep in-tow was in use pursuant to similar policy language where, although Jeep did not collide with the opposing vehicle, Jeep was loaded with hunting equipment insured intended to use upon reaching his destination and the "Ford and the Jeep constituted a unit which the insured of both companies operated on the wrong side of the road, and caused the accident"); *State Farm Fire and Cas. Co. v. Pinson*, 984 F.2d 610, 612-613 (4th Cir. 1993) (finding, where relevant state's law interprets identical policy language broadly, a pontoon boat being towed was in "use" pursuant to watercraft liability policy, and noting that if the insurer "had wanted to exclude towing from the boat's liability coverage, it could easily have done so"); *Westfield Ins. Co. v. Aetna Life & Cas. Co.*, 739 P.2d 218, 222 (Ariz. App. 1987) (collecting cases and adopting "majority

16

view" of jurisdictions that a truck being towed by tow truck was in use by the tow truck driver for purposes of liability policy covering towed truck); and *State Farm Fire & Cas. Co. v. Erwin*, 393 So. 2d 996, 998-99 (Ala. 1981) (finding identical policy language "ambiguous" and concluding that, where insured's boat was involved in an accident while being towed for repairs, insurer "could have avoided the broad language used or specifically excluded out-of-water use of boatcraft in drafting its policy").

To be sure, some courts, construing the relevant language more narrowly, have determined that coverage does not apply in similar circumstances. *See, e.g., Sass v. Acuity*, 765 N.W.2d 582, 588 (Wis. Ct. App. 2009) (distinguishing *Pinson* and concluding that, given the inherent nature of a boat and its purpose to be used on the water, the "act of transporting a boat on a trailer" is not "a normal incident of the use itself," and, therefore, where a boat is towed on a trailer it merely "constitutes cargo upon the trailer" and is not in use); *Vann v. United Farm Mut. Ins. Co.*, 790 N.E. 2d 497, 503-04 (Ind. Ct. App. 2003) (finding no coverage under watercraft liability endorsement to homeowner's insurance policy where the watercraft endorsement did not clearly "set forth the conditions under which liability coverage is triggered with regard to the boat[,]" and boat was simply attached to a transport trailer which detached from automobile before colliding with injured party); and *Hannah v. Erie Ins. Exchange*, 537 A.2d 182, 183-84 (Del. 1987) (distinguishing "an insured vehicle in tow and an insured boat merely being transported as cargo" and concluding that a boat being transported upon a trailer is not in "use" and finding no "causal connection" between boat and accident where the boat "did not cause or contribute to the severity of the accident").

17

The parties' submissions, as well as the court's own research, indicates that the greater weight of authorities supports a finding of coverage in this instance. While again acknowledging that no case that is fully square with the facts of this case has been presented to or located by the court, considering the "broad" interpretation Maine affords both "arising out of" and "use" in the relevant policy language, the court finds the majority view persuasive as to how this issue should be decided under Maine law. Again, "use" of a motor vehicle in Maine encompasses more than simply operation of the vehicle. As such, "use" necessarily entails ordinary usages beyond "manipulation of the car's controls in order to propel it as a vehicle." *Union Mut. Fire Ins. Co.*, 521 A.2d at 310. Accordingly, it is immaterial to the court's analysis that, as argued by Plaintiff, "[t]he scooter was not being operated, driven, ridden, used, handled, occupied, engaged, or otherwise manipulated when the accident occurred." Doc. 29-1 at 12. Even if that statement, minus the legal conclusion that the scooter was not "used" at the time of the accident, is true, Maine law establishes that the standard for determining whether the scooter was in fact used at the time of the accident is broader than that. Furthermore, the fact that the policy defines "occupying," but does not require that an insured person be occupying, operating, driving, riding, handling, engaged with, or otherwise manipulating the scooter at the time of the accident, cuts against Plaintiff's argument.

The subject policy requires only that an accident arise out of the "use" of the scooter and some causal connection between the use and the accident. Because, by law, "use" is construed broadly to encompass the scooter's "employment for some purpose of the user," *Union Mut. Fir Ins. Co.*, 521 A.2d at 310 (citation omitted), and is therefore "reasonably

susceptible of different interpretations," *Foremost Ins. Co.*, 868 A.2d at 246 (quotation omitted), it is inherently ambiguous.  As such, the resulting ambiguity is to be construed against Plaintiff, as the preparer of the insurance contract, and in favor of coverage. *Genthner*, 681 A.2d at 482.  Construing the ambiguity here in favor of the insured, the court concludes that transporting a covered vehicle under the power of another vehicle so that the insured person may continue to use the transported vehicle upon reaching his destination is a normal, permissible, and foreseeable "use" of the transported vehicle under Maine law.

Likewise, the evidence in the record supports the conclusion that a "causal connection" exists between Boyden's "use" of the scooter and the accident.  Boyden testified that the weight of his traveling unit, especially considering that he was traveling downhill, prevented him from stopping in time to avoid the collision. Boyden Dep. (Doc. 29-3) at 38:20-39:13.  The scooter was a component part of the traveling unit and was contributing, even if only slightly, to the overall weight of the unit. There is no fact in evidence before the court tending to show that the scooter's weight did not, minimally, contribute to either Boyden's inability to stop or to the force with which Boyden's unit collided with the vehicle driven by Mr. Hill.  Thus, even if Boyden's use of his scooter was not the proximate cause of Mr. Hill's injuries, the evidence shows at least a "reasonable causal connection between the use and the injury." *Union Mut. Fire Ins. Co.*, 521 A.2d at 311.  This is all that Maine law requires in order to find coverage and trigger the insurer's duty to defend.

Viewing the policy as a whole, and considering the Maine construction principles already discussed, the court concludes that, at the least, "[a]n insured carefully reading the policy language could not determine whether [the underlying] plaintiff's claim is covered." *Genthner*, 681 A.2d at 480.  This conclusion is bolstered by a few simple observations.  First, Plaintiff, as the writer of the insurance contract, could have defined the operative terms—meaning "arising out of," "use," and "ownership"—in a manner to exclude situations where the scooter was put to some use by the insured, but was not occupied or otherwise being manipulated in its controls by the insured.  Plaintiff declined to do so.  Second, if Plaintiff found that task too difficult or disadvantageous for some unknown reason, Plaintiff could have simply excluded from liability an accident in which the scooter was not occupied or in mechanical operation, but was instead involved only as "cargo" in a larger traveling unit.  Despite more than fifty years of cases finding vehicles in "use" under identical policy language when such vehicles are in-tow or loaded on trailers, *see supra*, Plaintiff declined to do so.[5]  It is highly foreseeable that motorcycle owners will transport their motorcycles with the intention of using them upon reaching their destination.  It was especially foreseeable in this circumstance, where Plaintiff wrote a Maine motorcycle policy and sold it through a Maine agency, but appears to have directed correspondence about the policy to the insured at a residential address in Florida.

---

[5]   Plaintiff did take care to insert into the policy several specific exclusions, both ordinary and extraordinary, to its liability coverage.  For example, liability coverage is excluded where, *inter alia*, the scooter is used to escort persons or property for a fee, or for general employment or business purposes, or for racing, stunts, or speed demonstrations, or for "bodily injury or property damage due to a nuclear reaction or radiation[,]" or for bodily injury or property damage resulting from intentional and/or criminal acts.  Doc. 29-4 at 17-18.

Under the guiding principles discussed in this Opinion, the court cannot conclude that the scooter was not being put to use by Boyden, or that there is not at least a reasonable causal connection between Boyden's use of the scooter and the accident in the underlying litigation.  Plaintiff was in the best position to avoid or correct any ambiguity in its own policy but failed to do so, and, as a result, an ordinary insured carefully reading the subject policy language would not be able to tell whether the underlying plaintiff's claim is covered by the policy.  As such, because there is at least a potential that proof of the facts alleged in the underlying complaint will come within the coverage afforded by the policy, the court cannot conclude that Plaintiff is not required to defend and indemnify Boyden in the underlying litigation, or that there is no coverage for the underlying plaintiff's claims against Boyden.

## V.   CONCLUSION

For all of the foregoing reasons, it is ORDERED as follows:

Plaintiff's Motion for Summary Judgment (Doc. 29) is DENIED and Defendants Boyden's and Hill's Motions for Summary Judgment (Docs. 31 & 32) are GRANTED. A separate declaratory judgment shall issue.

Done this 17th day of March, 2017.

/s/ Wallace Capel, Jr.
CHIEF UNITED STATES MAGISTRATE JUDGE